
# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-07-342-CV

IN THE INTEREST OF A.L.W.,
MINOR CHILD

------------

FROM THE 211TH DISTRICT COURT OF DENTON COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### Introduction

Appellant C.L.W. appeals the trial court's order terminating her parental rights to her daughter, A.L.W. In her first six points, appellant argues that the evidence is legally and factually insufficient to support any of the three statutory grounds for termination pleaded by the Texas Department of Family and Protective Services (TDFPS). *See* TEX. FAM. CODE ANN. § 161.001(1)(D),

---

[1] *See* TEX. R. APP. P. 47.4.

(E), (O) (Vernon Supp. 2007).  Appellant also argues that the trial court erred in overruling her objection to the State's standing to contest her indigency for purposes of appointment of appellate counsel.

**Background Facts**

In January 2006, appellant admitted that she had done methamphetamines, while on probation for felony auto theft.  In March 2006, appellant discovered that she was pregnant.  A.L.W. was born ten weeks premature on July 29, 2006.  On August 31, 2006, TDFPS received a referral alleging that appellant had physically abused A.L.W.  On September 11, 2006, TDFPS removed A.L.W. while A.L.W. was still in the hospital because of the referral and appellant's history of drug abuse.  Appellant's other two children, C.L. and C.D., had been removed in June 2005 because of appellant's drug use and neglectful supervision.[2]  TDFPS placed all of the children with appellant's father Roger.[3]

---

[2] In December 2006, the trial court signed the final order in C.L.'s and C.D.'s case and appointed appellant's father, Roger W., as the boys' primary managing conservator and appellant as possessory conservator.

[3] A.L.W.'s alleged father, C.M.L., could not be located and did not appear at trial.  The trial court terminated his parental rights on September 14, 2007.  He did not appeal that order.

In May 2007, doctors diagnosed A.L.W. with cerebral palsy.  She will probably never be able to walk, talk, or care for herself.  She has difficulty eating because of a high palate and muscular problems in and around her mouth.  In addition, A.L.W. requires special assistance and equipment to bathe.  She is unable to sit up and will continue to struggle with other basic life skills.  A.L.W. has extensive muscle problems and requires constant attention.

In November 2006, appellant again tested positive for drugs after a hair follicle test.  In January and February 2007, appellant admitted to using drugs, and urinary analysis (UA) and hair follicle tests confirmed that she was positive for both methamphetamines and cocaine.  In the early morning hours of February 22, 2007, police arrested appellant for public intoxication after she became drunk and got in a fight with a girl at a bar.  Appellant missed her TDFPS hearing later that day and spent three months in jail.

On March 18, 2007, while appellant was in jail, A.L.W. went to live with appellant's half-sister, Penny G., in Colorado.  Although TDFPS had initially placed A.L.W. with Roger, he gave A.L.W. to appellant's mother, Sandra T., without telling TDFPS.  Sandra then sought to have A.L.W. placed with Penny.  Penny and her husband were state troopers, and they had three children.  They welcomed A.L.W. into their home and provided her with therapy and medical care.  Penny wanted to adopt A.L.W.

3

On May 13, 2007, appellant was released from jail. By June 2007, appellant had not participated in out-patient drug treatment or counseling, attended Alcoholics Anonymous (AA) or Narcotics Anonymous (NA) meetings, or submitted to random drug tests.

The termination bench trial was held on July 25 and September 14, 2007. Shelby Johnson, a TDFPS caseworker assigned to appellant's case since August 2006, testified that appellant had a pattern of not taking an active role in her service plan until TDFPS reached the point of terminating her parental rights. For example, in C.L.'s. and C.D.'s case, appellant would not participate in her required service plan until she thought she would lose custody of her sons, and then she would become more serious about completing her program. Once TDFPS gave custody of C.L. and C.D. to her father, appellant discontinued her services.

Johnson testified that appellant had two years to complete the services requested by TDFPS in C.L.'s and C.D.'s case, but appellant had not yet resolved her issues. Johnson had concerns about appellant's long-term abilities as a parent, her pattern of inconsistency, and her refusal to take responsibility for her actions. Johnson stated that appellant had not done what was needed to regain full custody of her sons, and unlike A.L.W. they do not have special needs. Johnson testified that she never received documentation that appellant

4

attended NA or AA meetings. Appellant told Johnson that she did not want to attend NA meetings because she would see old friends, but Johnson testified that she did not believe appellant was being honest or serious. Johnson believed that appellant just did not want to go to the meetings. Johnson testified that she had worked with appellant for three years and did not believe anything appellant said because she had consistently lied throughout the case. Johnson recommended that appellant's parental rights be terminated based on her failure to comply with her service plan.

CASA volunteer June Splain, who became involved with appellant's case in October 2006, testified regarding appellant's employment. She stated that she was unable to verify three of appellant's previous places of employment. Additionally, Splain never received any documentation from appellant regarding her employment or her AA or NA classes. Splain testified that appellant completed parenting classes and a psychological evaluation, but appellant did not complete the follow-up requirements of the psychological evaluation or comply with the counseling order. Splain also testified that A.L.W. needed a home with stability, consistency, nurturing, and love, which appellant had not been able to provide but Penny had. Additionally, Splain testified that appellant and Roger were in denial about A.L.W.'s condition and disagreed that she had needed therapy immediately. Appellant did not understand the type of daily

5

care and therapies that A.L.W. required. Splain stated that appellant was not in compliance with her service plan and did not have the required skills to care for A.L.W. She believed that it was in A.L.W.'s best interest for appellant's parental rights to be terminated.

Nicole Jordan testified that she had been appellant's NA sponsor for two weeks and that appellant had been clean for six or seven months. She stated that they talked on a daily basis. She believed that appellant wanted to succeed and that she was a protective and caring mother. She testified that she had seen changes in appellant, such as more love and compassion.

Appellant's father, Roger, testified that he had seen dramatic changes in appellant's life; for example, she did not have an attitude anymore, and she was not aggressive. He testified that appellant was more understanding with her sons and not as selfish. He also stated that appellant needed more time to make additional changes, but she was headed in the right direction.

Appellant's mother, Sandra, testified that appellant had sporadically lived with her until January 2006 when Sandra told her to move out because appellant was staying out all night. She stated that they had not always had a good relationship and that appellant had been angry, but appellant had changed in the last three months. Sandra testified that appellant was no longer angry, was more focused and relaxed, and had apologized for the past.

6

Appellant's relationship with C.L. and C.D. had also changed; for example, appellant interacted with them much better, and they seemed happy with her. Sandra testified that she had never seen a change like this in appellant, and she would not be testifying in court if she did not think appellant had changed. Sandra believed that appellant needed more time but that she was finally going in the right direction.

Sandra's husband and appellant's stepfather, Gary T., agreed with Sandra and testified that appellant had recently become a much better parent. He stated that appellant was more level, balanced, and had taken responsibility for her actions. Because he was also a former drug addict, Gary testified that when appellant cut ties with her drug friends, he knew that she was serious. Gary also testified that appellant needed more time to make these changes.

Kade Wall, appellant's boyfriend, testified that they had been together since February 2007. He stated that he had seen changes in her temperament; for example, she does not fight with her family anymore. Wall testified that he and appellant had plans for a long-term relationship and planned to buy a house. He also testified that appellant had not had any contact with her drug friends and made a lot of progress. He stated he was prepared to take care of A.L.W. if something happened to appellant.

7

After Wall's testimony, the trial court recessed until appellant's counselor could testify. The trial court reconvened on September 14, 2007. Michelle Greer, a professional counselor, testified that appellant began seeing her in February 2006. She stated that she and appellant had met for fourteen sessions and that she had last seen appellant in August 2007. Greer testified that appellant had not been sober for the required six to eight months but that she had made progress. However, Greer also believed that appellant could not maintain sobriety outside of jail and could not care for A.L.W. Additionally, Greer testified that appellant had not accepted responsibility for her actions and was at risk for relapsing as she had done previously.

The trial court determined that appellant (1) knowingly placed or knowingly allowed A.L.W. to remain in conditions which endangered her physical and emotional well-being, (2) engaged in conduct or knowingly placed A.L.W. with persons who engaged in conduct which endangered her physical or emotional well-being, (3) failed to comply with provisions of her service plan, and that (4) termination was in A.L.W.'s best interest. *See* TEX. FAM. CODE ANN. §§ 161.001(1)(D), (E), (O) & (2). Appellant timely filed this appeal.

**Standard of Review**

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to end them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. TEX. FAM. CODE ANN. § 161.206(b) (Vernon Supp. 2007); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20-21; *In re E.M.N.*, 221 S.W.3d 815, 820 (Tex. App.—Fort Worth 2007, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground

listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence. TEX. FAM. CODE ANN. §§ 161.001, 161.206(a); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re C.S.*, 208 S.W.3d 77, 83 (Tex. App.—Fort Worth 2006, pet. denied). It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2002).

**Legal sufficiency**

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a fact-finder could

reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id.* This means that we must assume that the fact-finder resolved any disputed facts in favor of its finding if a reasonable fact-finder could have done so. *Id.* We must also disregard all evidence that a reasonable fact-finder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it is contrary to the finding. *Id.* That is, we must consider evidence favorable to termination if a reasonable fact-finder could, and disregard contrary evidence unless a reasonable fact-finder could not. *Id.*

We must therefore consider all of the evidence, not just that which favors the verdict. *Id.* But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the fact-finder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we must defer to the fact-finder's determinations as long as they are not unreasonable. *Id.* at 573.

**Factual sufficiency**

In reviewing the evidence for factual sufficiency, we must give due deference to the fact-finder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine

11

whether, on the entire record, a fact-finder could reasonably form a firm conviction or belief that the parent violated subsection (D) or (E) of section 161.001(1) and that the termination of the parent's parental rights would be in the best interest of the child. *C.H.*, 89 S.W.3d at 28.

### Endangerment Findings

In appellant's first through fourth points, she argues that the evidence is legally and factually insufficient to support the trial court's determination that she (1) knowingly placed or knowingly allowed A.L.W. to remain in conditions or surroundings that endangered her physical or emotional well-being and (2) engaged in conduct or knowingly placed A.L.W. with persons who engaged in conduct that endangered her physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E).

Endangerment means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under subsection (D) of family code section 161.001(1), we must examine the evidence related to the environment of the child to determine if the environment was the source of the endangerment to the child's physical or emotional well-being. *J.T.G.*, 121 S.W.3d at 125; *In re D.T.*, 34 S.W.3d 625, 632 (Tex. App.—Fort Worth 2000, pet. denied). Conduct of a parent in the home can create an environment that endangers the

12

physical or emotional well-being of a child. *J.T.G.*, 121 S.W.3d at 125; *In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ). For example, parental and caregiver illegal drug use and drug-related criminal activity support the conclusion that the child's surroundings endanger her physical or emotional well-being. *J.T.G.*, 121 S.W.3d at 125.

Under subsection (E), we must determine whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *Id.* Additionally, termination under section 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. TEX. FAM. CODE ANN. § 161.001(1)(E); *D.T.*, 34 S.W.3d at 634. However, it is not necessary that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125.

To determine whether termination is necessary under subsection (E), courts look to parental conduct before and after the child's birth. *J.T.G.*, 121 S.W.3d at 125*; In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.). A mother's drug use during pregnancy may amount to conduct that endangers the physical and emotional well-being of the child. *J.T.G.*, 121 S.W.3d at 125*; In re K.M.B.*, 91 S.W.3d 18, 25 (Tex. App.—Fort Worth 2002,

13

no pet.). Additionally, drug addiction and its effect on a parent's life and ability to parent may establish an endangering course of conduct as well. *J.T.G.*, 121 S.W.3d at 125-26.

Imprisonment alone does not constitute endangering conduct, but it is a factor that the trial court can consider on the issue of endangerment. *Boyd*, 727 S.W.2d at 533-34; *D.M.*, 58 S.W.3d at 812. The State, however, does not need to show that incarceration was a *result* of a course of conduct that endangered the child; it only needs to show incarceration was a *part* of a course of conduct that endangered the child. *D.M.*, 58 S.W.3d at 812. Thus, if the evidence, including imprisonment, proves a course of conduct that has the effect of endangering the child, the requirement of subsection (E) is met. *Boyd*, 727 S.W.2d at 533-34; *D.M.*, 58 S.W.3d at 812.

**Analysis**

The evidence shows that appellant continuously abused drugs, even during her pregnancy. Appellant began using drugs when she was sixteen and continued doing drugs until a few months before the trial. Appellant used drugs before and after TDFPS removed her two sons, C.L. and C.D., while pregnant with A.L.W., and after TDFPS removed A.L.W.

Additionally, appellant had three years to participate in her service plan and get drug treatment, but at the time of trial, appellant had just started her

14

drug treatment program, which had been one of TDFPS's main concerns. The record demonstrates that although appellant completed in-patient drug rehab, she did not participate in out-patient treatment. Appellant testified that she attended NA and AA meetings although she did not provide documentation to Johnson or Splain. Appellant had maintained street sobriety for two to three months before trial and testified that she voluntarily took UAs every Monday and Friday.

The record also demonstrates that appellant did not complete her service plan or probation requirements, which included securing employment, obtaining housing, and paying child support. However, appellant testified that she had completed all of her service plan requirements except for attending NA meetings five times a week or having a job for the required six months. She stated that she attended NA and AA meetings from July 2006 until January or February 2007, but she did not provide TDFPS with any documentation. Appellant also testified that, at the time of trial, she was involved in intensive outpatient treatment four times a week and attended NA meetings once a week.

Appellant also testified that she had had a job for the past two months. She admitted that she had not worked regularly throughout A.L.W.'s case, but

15

she had been working at the 440 Ranch the past two months. At the time of trial, appellant lived with boyfriend Wall in an apartment. She also got her GED.

Appellant had not paid child support at the time of trial, but she testified that she had the money and tried to make payments but was told that the account was not set up. However, Johnson testified that she did not know what appellant was talking about and that appellant had never asked her for help with the account.[4]

The record shows that appellant completed parenting classes, although she did not attend the final review session. Appellant also completed her psychological evaluation although did not follow through with her doctor's recommendations. She also admitted that she violated her service plan by committing criminal offenses.

Additionally, the record demonstrates that every time appellant used methamphetamines, she also engaged in criminal activity. As a result of appellant's criminal activity, she had been in jail or on probation before and after A.L.W.'s birth. For example, police arrested appellant for DWI and possession of methamphetamines in Denton County in January 2003. Appellant received five years probation for those charges and was placed on house arrest for eight

---

[4] At trial, the trial judge arranged an order for appellant to pay her child support to the court's registry during the afternoon recess.

months.  On August 19, 2006, police arrested appellant for public lewdness; the trial court revoked her probation and appellant went to jail until April 2005.  In September 2005, police arrested appellant for felony auto theft.  Appellant received probation and entered an inpatient drug treatment program, but the trial court revoked her probation when she tested positive for drugs in March 2006.  In November 2006, appellant's hair follicle exam tested positive for methamphetamines, although appellant testified that she did not use methamphetamines; she stated that she was in a room where her friends were using drugs.  In February 2007, police arrested appellant for public intoxication and she spent three months in jail.  From A.L.W.'s birth until the time of trial, appellant had been in jail three months of her twelve-month life for probation violations.

Appellant's continuous abuse of illegal drugs threatened A.L.W.'s physical and emotional well-being.  Additionally, A.L.W. suffered from cerebral palsy and required constant care and supervision.  *But see In re D.J.J.*, 178 S.W.3d 424, 429-30 (Tex. App.—Fort Worth 2005, no pet.) (holding evidence insufficient to prove endangerment because there was no evidence that parent's drug use created a dangerous environment).  Appellant testified that A.L.W.'s prematurity was linked to her cerebral palsy, not to appellant's drug use.  Appellant testified that she had made provisions for A.L.W. at the Scottish Rite

17

Hospital and found a retired nurse to care for her during the day. However, Penny testified that Roger, Sandra, and appellant told her that although A.L.W. was born premature, nothing was wrong with her. Penny stated that if A.L.W. had received therapy before coming to her home, A.L.W. would have been further along in her development.

Although appellant testified that she needed more time to work on her life, TDFPS gave appellant longer than most parents to make changes and get her life in order, but she had continued the same cycle of drug abuse and criminal activity. The record shows that appellant repeatedly engaged in a voluntary, deliberate, and conscious course of conduct related to drug use, criminal activity, unemployment, and instability. TEX. FAM. CODE ANN. § 161.001(1)(D), (E); *D.T.*, 34 S.W.3d at 634.

Based on our review of the entire record, we conclude that a factfinder could reasonably form a firm belief or conviction that appellant (1) engaged in conduct that endangered the physical or emotional well-being of A.L.W. and (2) knowingly placed or knowingly allowed her child to remain in conditions or surroundings that endangered her physical and emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E). Therefore, we hold that the evidence is legally and factually sufficient to support the trial court's findings under section 161.001(1)(D) and (E). *Id.*; *see In re S.B.,* 207 S.W.3d 877, 885 (Tex.

18

App.—Fort Worth 2006, no pet.).  We overrule appellant's first, second, third, and fourth points.

### Failure to Comply with Court Order

In appellant's fifth and sixth points, she claims that the evidence was legally and factually insufficient to terminate her parental rights for failure to comply with the provisions of a court order necessary to obtain the return of A.L.W.  *See* TEX. FAM. CODE ANN. § 161.001(1)(O).

Only one finding under section 161.001(1) is necessary to support a judgment of termination.  *Id.* § 161.001(1); *In re K.A.S.,* 131 S.W.3d 215, 225 (Tex. App.—Fort Worth 2004, pet. denied); *D.M.,* 58 S.W.2d at 813.  Because we conclude that there is both legally and factually sufficient evidence to support the trial court's findings under family code section 161.001(1)(D) and (E), we need not address appellant's remaining points with respect to the trial court's finding under section 161.001(1)(O).   TEX. FAM. CODE ANN. § 161.001(1)(D), (E), (O); *see* TEX. R. APP. P. 47.1; *K.A.S.*, 131 S.W.3d at 225.

### Appellant's Objection to the State's Standing to Contest Her Indigency

In her seventh point, appellant argues that the trial court erred in overruling her objection to the State's standing to contest her indigency for purposes of appointment of appellate counsel and a free reporter's record.

Because the trial court found appellant indigent, appointed appellate counsel, and ordered a free reporter's record, appellant's issue on appeal is moot. *Valley Baptist Med. Ctr. v. Gonzalez,* 33 S.W.3d 821, 822 (Tex. 2000). To avoid issuing an advisory opinion, we do not address appellant's seventh point. *Id.; see also In re D.D.J.,* 136 S.W.3d 305, 315 (Tex. App.—Fort Worth 2004, no pet.).

### Conclusion

Having overruled all of appellant's dispositive points, we affirm the trial court's judgment.

TERRIE LIVINGSTON
JUSTICE

PANEL F:   LIVINGSTON, WALKER, and MCCOY, JJ.

DELIVERED: April 17, 2008

20